Dissent by Judge FRIEDLAND
OPINION
W. FLETCHER, Circuit Judge:
A City of Berkeley ordinance requires cell phone retailers to inform prospective cell phone purchasers that carrying a cell phone in certain ways may cause them to exceed Federal Communications Commission guidelines for exposure to radio-frequency radiation. CTIA, a trade association formerly known as Cellular Telephone Industries Association, challenges the ordinance on two grounds. First, it argues that the ordinance violates the First Amendment. Second, it argues that the ordinance is preempted.
CTIA requested a preliminary injunction staying enforcement of the ordinance. The district court denied CTIA’s request, and CTIA filed an interlocutory appeal. We affirm and remand for further proceedings.
I. Factual and Procedural Background
In May 2015, the City of Berkeley passed an ordinance requiring cell phone retailers to disclose information to prospective cell phone purchasers about the federal government’s radio-frequency radiation exposure guidelines relevant to cell phone use. Under “Findings and Purpose,” the ordinance provided:
A. Requirements for the testing of cell phones were established by the federal government in 1996.
B. These requirements established “Specific Absorption Rates” (SAR) for cell phones.
C. The protocols for testing the SAR for cell phones carried on a person’s body assumed that they would be carried a small distance away from the body, e.g., in a holster or belt clip, which was the common practice at that time. Testing of cell phones under these protocols has generally been conducted based on an assumed separation of 10-15 millimeters.
D. To protect the safety of their consumers, manufacturers recommend that their cell phones be carried away from the body, or be used in conjunction with hands-free devices.
E. Consumers are not generally aware of these safety recommendations.
F. Currently, it is much more common for cell phones to be carried in pockets or other locations rather than holsters or belt clips, resulting in much smaller separation distances than the safety recommendations specify.
G. Some consumers may change their behavior to better protect themselves and their children if they were aware of these safety recommendations.
H. While the disclosures and warnings that accompany cell phones generally advise consumers not to wear them against their bodies, e.g., in pockets, waistbands, etc., these disclosures and warnings are often buried in fine print, are not written in easily understood lan *1111 guage, or are accessible only by looking for the information on the device itself.
I.The purpose of this Chapter is to assure that consumers have the information they need to make their own choices about the extent and nature of their exposure to radio-frequency radiation.
Berkeley Mun. Code § 9.96.010 (2015).
CTIA challenged the compelled disclosure provision of the ordinance, arguing that it violated the First Amendment and was preempted. One sentence of the compelled disclosure stated, “The potential risk is greater for children.” The district court held that this sentence was preempted, and it issued a preliminary injunction against enforcement of the ordinance. In December 2015, Berkeley re-passed the ordinance without the offending sentence. In its current form, the compelled disclosure provision provides:
A. A Cell phone retailer shall provide to each customer who buys or leases a Cell phone a notice containing the following language:
The City of Berkeley requires that you be provided the following notice: To assure safety, the Federal Government requires that cell phones meet radio-frequency (RF) exposure guidelines. If you carry or use your phone in a pants or shirt pocket or tucked into a bra when the phone is ON and connected to a wireless network, you may exceed the federal guidelines for exposure to RF radiation. Refer to the instructions in your phone or user manual for information about how to use your phone safely.
Berkeley Mun. Code § 9.96.030(A) (2015).
The ordinance requires that the compelled disclosure be provided either on a prominently displayed poster no less than 8 ½ by 11 inches with no smaller than 28-point font, or on a handout no less than 5 by 8 inches with no smaller than 18-point font. The logo of the City of Berkeley must be placed on the poster and handout. The ordinance provides that a cell phone retailer may include additional information on the poster or handout if it is clear that the additional information is not part of the compelled disclosure. § 9.96.030(B) (“The paper on which the notice is printed may contain other information in the discretion of the Cell phone retailer, as long as that information is distinct from the notice language required by subdivision (A) of this Section.”).
CTIA challenged the current ordinance, arguing, as it had before, that the ordinance violates the First Amendment and is preempted. The district court noted that the preempted sentence had been removed from the ordinance, dissolved its previously entered injunction, and denied CTIA’s request for a new preliminary injunction. CTIA filed an interlocutory appeal.
II.Jurisdiction and Standard of Review
We have jurisdiction under 28 U.S.C. § 1292. We review a denial of a preliminary injunction for abuse of discretion. Inst. of Cetacean Research v. Sea Shepherd Conservation Soc’y, 725 F.3d 940, 944 (9th Cir. 2013). “An abuse of discretion occurs when the district court based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence.” Friends of the Wild Swan v. Weber, 767 F.3d 936, 942 (9th Cir. 2014) (citation and internal quotation marks omitted). We will not reverse the district court where it “got the law right,” even if we “would have arrived at a different result,” so long as the district court did not clearly err in its factual determinations. Lands Council v. McNair, 537 F.3d 981, 987 (9th Cir. 2008) (en banc).
III.Regulatory Background
The Federal Communications Commission (“FCC”) has regulatory jurisdiction *1112 over transmitting services in the United States. In 1996, after extensive consultation with other agencies, the FCC issued a rule designed to limit the Specific Absorption Rate (“SAR”) of radio-frequency (“RF”) radiation from FCC-regulated transmitters, including cell phones:
1. By this action, we are amending our rules to adopt new guidelines and methods for evaluating the environmental effects of radio-frequency (RF) radiation from FCC-regulated transmitters. We are adopting Maximum Permissible Exposure (MPE) limits for electric and magnetic field strength and power density for transmitters operating at frequencies from 300 kHz to 100 GHz ... We are also adopting limits for localized (“partial body”) absorption that will apply to certain portable transmitting devices ... We believe that the guidelines we are adopting will protect the public and workers from exposure to potentially harmful RF fields.
2. In reaching our decision on the adoption of new RF exposure guidelines we have carefully considered the large number of comments submitted in this proceeding, and particularly those submitted by the U.S. Environmental Protection Agency (EPA), the Food and Drug Administration (FDA) and other federal health and safety agencies. The new guidelines we are adopting are based substantially on the recommendations of those agencies, and we believe that these guidelines represent a consensus view of the federal agencies responsible for matters relating to the public safety and health.
In re Guidelines for Evaluating the Environmental Effects of Radio-frequency Radiation, 61 Fed. Reg. 41006, 41006-07 (Aug. 7,1996) (emphases added).
Out of concern for the safety of cell phone users, the FCC rejected an industry proposal to exclude “low-power devices” such as cell phones from the rule adopting SAR limits:
Most commenting parties, including Federal health and safety agencies, support the use of the ANSI/IEEE [American National Standards Institute/ Institute of Electrical and Electronic Engineers] SAR limits for localized (partial body) exposure for evaluating low-power devices designed to be used in the immediate vicinity of the body.... Therefore, in view of the consensus and the scientific support in the record, we are adopting the SAR limits for the determination of safe exposure from low-power devices designed to be used in the immediate vicinity of the body based upon the 1992 ANSI/IEEE guidelines....
The SAR limits we are adopting will generally apply to portable devices ... that are designed to be used with any part of the radiating structure of the device in direct contact with the body of the user or within 20 cm of the body under normal conditions of use. For example, this definition would apply to hand-held cellular telephones....
In re Guidelines for Evaluating the Environmental Effects of Radio-frequency Radiation (“FCC Guidelines for Radiofre-quency Radiation”), FCC 96-326, ¶¶ 62-63 (Aug. 1,1996) (emphases added).
The FCC has a better-safe-than-sorry policy with respect to SAR limits:
... The intent of our exposure limits is to provide a cap that both protects the public based on scientific consensus and allows for efficient and practical implementation of wireless services. The present Commission exposure limit is a “bright-line rule.” That is, so long as exposure levels are below a specified limit value, there is no requirement to further reduce exposure.... Our current RF exposure guidelines are an ex *1113 ample of such regulation, including a significant “safety” factor, whereby the exposure limits are set at a level on the order of 50 times below the level at which adverse biological effects have been observed in laboratory animals as a result of tissue heating resulting from RF exposure.
In re Reassessment of FCC Radiofrequency Exposure Limits and Policies, 28 FCC Rcd. 3498, 3582 (Mar. 29, 2013). The FCC recognizes that its required margin of safety is large:
... [Exceeding the SAR limit does not necessarily imply unsafe operation, nor do lower SAR quantities imply “safer” operation. The limits were set with a large safety factor, to be well below a threshold for unacceptable rises in tissue temperature. As a result, exposure well above the specified SAR limit should not create an unsafe condition.... In sum, using a device against the body without a spacer will generally result in actual SAR below the maximum SAR tested; moreover, a use that possibly results in non-compliance with the SAR limit should not be viewed with significantly greater concern than compliant use.
Id. at 3588 (emphasis added).
There are two ways to ensure compliance with SAR limits — reducing the amount of RF radiation from a transmitting device, and increasing the distance between the device and the user. Different low-power devices emit different amounts of RF radiation, with the result that the minimum distance between the device and the user to achieve compliance with SAR limits varies somewhat from device to device. The FCC requires that cell phone user manuals contain information that alerts users to the minimum distances appropriate for the device they are using:
Specific information must be included in the operating manuals to enable users to select body-worn accessories that meet the minimum test separation distance requirements. Users.must be fully informed of the operating requirements and restrictions, to the extent that the typical user can easily understand the information, to acquire the required body-worn accessories to maintain compliance. Instructions on how to place and orient a device in body-worn accessories, in accordance with the test results, should also be included in the user instructions. All supported body-worn accessory operating configurations must be clearly disclosed to users, through conspicuous instructions in the user guide and user manual, to ensure unsupported operations are avoided.
In re Exposure Procedures and Equipment Authorization Policies for Mobile and Portable Devices, FCC Office of Engineering and Technology Laboratory Division § 4.2.2(d) (Oct. 23, 2015) (“FCC Exposure Procedures”) (emphasis added). Compliance with this disclosure requirement is a prerequisite for approval of a transmitting device by the FCC. See id. at § 1.
The following are examples of cell phone user manuals that comply with the FCC’s disclosure requirement:
Apple:
iPhone’s SAR measurement may exceed the FCC exposure guidelines for body-worn operation if positioned less than 15 mm (5/8 inch) from the body (e.g. when carrying iPhone in your pocket).
See iPhone 3G manual, at 7, http:// manuals.info.apple.com/MANUALS/0/MA 618/en_US/iPhone„3G_Important_ Product_Information_Guide.pdf
Samsung:
If there is a risk from being exposed to radio-frequency energy (RF) from cell phones — and at this point we do not know that there is — it is probably very small. But, if you are concerned *1114 about avoiding even potential risks, you can take a few simple steps to minimize your RF exposure.
• Reduce the amount of time spent using your cell phone;
• Use speaker mode or a headset to place more distance between your head and the cell phone.
See Samsung Common Phone Health and Safety and Warranty Guide, at 8, http:// www.samsung.com/us/Legal/PHONE-HS_ GUIDE_English.pdf.
LG:
The highest SAR value for this model phone when tested for use at the ear is 1.08 W/Kg (lg) and when worn on the body, as described in this user guide, is 0.95 W/Kg (lg) (body-worn measurements differ among phone models, depending upon available accessories and FCC requirements). While there may be differences between SAR levels of various phones and at various positions, they all meet the government requirement for safe exposure. The FCC has granted an Equipment Authorization for this model phone with all reported SAR levels evaluated as in compliance with the FCC RF emission guidelines. SAR information on this model phone is on file with the FCC and can be found under the Display Grant section of http://www.fcc.gov/oet/ea/fccid/ after searching on FCC ID ZNFL15G.
See LG Sunrise User Guide, at 93, http:// www.lg.com/us/support/manuals-documents
IV. Discussion
“A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest.” Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). “[A] stronger showing of one element may offset a weaker showing of another.” Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1131 (9th Cir. 2011). For example, “a preliminary injunction could issue where the likelihood of success is such that ‘serious questions going to the merits were raised and the balance of hardships tips sharply in [plaintiffs] favor.’ ” Id. at 1132 (quoting Clear Channel Outdoor, Inc. v. City of Los Angeles, 340 F.3d 810, 813 (9th Cir. 2003)).
A. Likelihood of Success
CTIA makes two merits-based arguments against the Berkeley ordinance. First, it argues that the ordinance violates the First Amendment: Second, it argues that the ordinance is preempted. We take the arguments in turn.
1. First Amendment
The underlying disclosure at issue is the disclosure that the FCC compels cell phone manufacturers to provide to consumers. However, CTIA has not sued the FCC. Rather, CTIA has sued Berkeley, challenging the disclosure Berkeley compels cell phone retailers to provide to the same consumers. The Berkeley ordinance requires cell phone retailers to disclose, in summary form, the same information to consumers that the FCC already requires cell phone manufacturers to disclose. The Berkeley disclosure then directs consumers to user manuals for more specific information.
a. Central Hudson or Zauderer
The parties agree that Berkeley’s ordinance is a regulation of commercial speech. Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm’n of N.Y., 447 U.S. 557, 561, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980); see *1115 Hunt v. City of L.A., 638 F.3d 703, 715 (9th Cir. 2011). However, they disagree about whether the ordinance’s compliance with the First Amendment should be analyzed under Central Hudson or under Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio, 471 U.S. 626, 105 S.Ct. 2265, 85 L.Ed.2d 652 (1985).
 Under Central Hudson, the government may restrict or prohibit commercial speech that is neither misleading nor connected to unlawful activity, as long as the governmental interest in regulating the speech is substantial. 477 U.S. at 564, 106 S.Ct. 2686. The restriction or prohibition must “directly advance the governmental interest asserted,” and must not be “more extensive than is necessary to serve that interest.” Id. at 566, 106 S.Ct. 2686. Under Zauderer as we interpret it today, the government may compel truthful disclosure in commercial speech as long as the compelled disclosure is “reasonably related” to a substantial governmental interest. Zauderer, 471 U.S. at 651, 105 S.Ct. 2265; see discussion infra.
We apply the intermediate scrutiny test mandated by Central Hudson in commercial speech cases where speech is restricted or prohibited, on the ground that in such cases intermediate scrutiny appropriately protects the interests of both the speaker (the seller) and the audience (the purchaser). But one size does not fit all in commercial speech cases. In Central Hudson itself, the Supreme Court cautioned, “The protection available for particular commercial expression turns on the nature both of the expression and of the governmental interests served by its regulation.” Central Hudson, 477 U.S. at 563, 106 S.Ct. 2686.
Five years after Central Hudson, the Court held that Central Hudson’s intermediate scrutiny test does not apply to compelled, as distinct from restricted or prohibited, commercial speech. In Zauderer, defendant Zauderer advertised legal services to prospective Daikon Shield plaintiffs in a number of Ohio newspapers. The advertisement stated, inter alia, “ ‘The cases are handled on a contingent fee basis of the amount recovered. If there is no recovery, no legal fees are owed by our clients.’” Zauderer, 471 U.S. at 631, 105 S.Ct. 2265. Zauderer was disciplined under Ohio state bar disciplinary rules on the ground that the advertisement was “deceptive” within the meaning of the rules, id. at 633, 105 S.Ct. 2265, because it failed to disclose “the client’s potential liability for costs even if her suit were unsuccessful.” Id. at 635, 105 S.Ct. 2265. The Court noted that the bar disciplinary rules required Zauderer to “include in his advertising purely factual and uncontroversial information about the terms under which his services will be available.” Id. at 651, 105 S.Ct. 2265. The Court wrote, “Ohio has not attempted to prevent attorneys from conveying information to the public; it has only required them to provide somewhat more information than they might otherwise be inclined to present.” Id. at 650, 105 S.Ct. 2265. The Supreme Court declined to apply the Central Hudson test:
Because the extension of First Amendment protection to commercial speech is justified principally by the value to consumers of the information such speech provides, appellant’s constitutionally protected interest in not providing any particular factual information is minimal .... We recognize that unjustified or unduly burden some disclosure requirements might offend the First Amendment by chilling protected commercial speech. But we hold that an advertiser’s rights are adequately protected as long as disclosure requirements are reasonably related to the State’s interest in preventing deception of consumers.
*1116 Id. at 651, 105 S.Ct. 2265 (internal citation omitted). See also Milavetz, Gallop & Milavetz, P.A. v. United States, 559 U.S. 229, 253, 130 S.Ct. 1324, 176 L.Ed.2d 79 (2010) (following Zauderer and using its “preventing deception” language).
b. The Zauderer Test
i. Substantial Governmental Interest
CTIA contends that the Zauderer exception to the general rule of Central Hudson does not apply in this case because the speech compelled by the Berkeley ordinance does not prevent deception of consumers. This is the first time we have had occasion in this circuit to squarely address the question whether, in the absence of a prevention-of-deception rationale, the Zau-derer eompelled-diselosure test applies. Cf. Video Software Dealers Ass’n v. Schwarzenegger, 556 F.3d 950, 967 (9th Cir. 2009) (invalidating compelled disclosure on video game packaging, noting that the disclosure would “arguably now convey a false statement that certain conduct is illegal when it is not, and the State has no legitimate reason to force retailers to affix false information on their products”). Several of our sister circuits, however, have answered this question. They have unanimously concluded that the Zauderer exception for compelled speech applies even in circumstances where the disclosure does not protect against deceptive speech.
In American Meat Institute v. U.S. Department of Agriculture, 760 F.3d 18 (D.C. Cir. 2014) (en banc), a Department of Agriculture regulation required identification of the country of origin on the packaging of meat and meat products. Id. at 20. The regulation implemented a federal statute requiring country-of-origin labeling. See 7 U.S.C. § 1638, 1638a. The D.C. Circuit held that Zauderer should not be read to apply only to cases where government-compelled speech prevents or corrects deceptive speech. It noted that on the facts of both Zauderer and Milavetz (in which the Court repeated ZaudereYs “preventing deception” language) there had been deceptive speech: “Given the subject of both cases, it was natural for the Court to express the rule in such terms. The language could have been simply descriptive of the circumstances to which the Court applied its new rule[J” Am. Meat, 760 F.3d at 22. The D.C. Circuit concluded, “The language with which Zauderer justified, its approach ... sweeps far more broadly than the interest in remedying deception.” Id.
In National Electrical Manufacturers Association v. Sorrell, 272 F.3d 104 (2d Cir. 2001), a Vermont statute required manufacturers of mercury-containing products to label their products and packaging to inform consumers that the products contained mercury and instructing them that the products should be disposed of or recycled as hazardous waste. Id. at 107. The Second Circuit held that the compelled disclosure was supported by a “substantial state interest in protecting human health and the environment.” Id. at 115 n. 6. Citing Zauderer, the court recognized that the compelled disclosure did not “prevent ‘consumer confusion or deception.’ ” Sorrell, 272 F.3d at 115. It nonetheless upheld the disclosure as not “inconsistent with the policies underlying First Amendment protection of commercial speech.” Id. “[MJandated disclosure of accurate, factual, commercial information does not offend the core First Amendment values of promoting efficient exchange of information or protecting individual liberty interests.” Id. at 114; see also N.Y. St. Rest. Ass’n v. N.Y. City Bd. of Health, 556 F.3d 114, 133 (2d Cir. 2009) (“Zauderer s holding was broad enough to encompass nonmisleading disclosure requirements.”); Discount Tobacco City & Lottery, Inc. v. United States, 674 F.3d 509, 556-58 (6th Cir. 2012) (upholding federally required health warnings on cigarette packaging and in cigarette advertise *1117 ments, relying on the Second Circuit’s opinion in Sorrell); Pharm. Care Mgmt. Ass’n v. Rowe, 429 F.3d 294, 310 n.8 (1st Cir. 2005) (noting that the court had found no cases limiting application of the Zau-derer compelled speech test to prevention or correction of deceptive advertising); cf. Dwyer v. Coppell, 762 F.3d 275, 281-82 (3d Cir. 2014) (describing but not relying on ZauderePs preventing-deception criterion).
We agree with our sister circuits that under Zauderer the prevention of consumer deception is not the only governmental interest that may permissibly be furthered by compelled commercial speech. We conclude that any governmental interest will suffice so long as it is substantial. In American Meat, the D.C. Circuit declined to decide whether the governmental interest must be substantial, leaving open the question whether a less-than-substantial interest might suffice. See Am. Meat, 760 F.3d at 23 (“Because the interest motivating the 2013 [country-of-origin] rule is a substantial one, we need not decide whether a lesser interest could suffice under Zauderer”). We answer the question avoided in American Meat, holding that Zauderer requires that the compelled disclosure further some substantial — that is, more than trivial — governmental interest. Central Hudson explicitly requires that a substantial interest be furthered by a challenged regulation prohibiting or restricting commercial speech, and we see nothing in Zau-derer that would allow a lesser interest to justify compelled commercial speech. To use the words of the Second Circuit in Sorrell, the interest at stake must be more than the satisfaction of mere “consumer curiosity.” Sorrell, 272 F.3d at 115 n.6; see also Am. Meat, 760 F.3d at 23 (“Country-of-origin information has an historical pedigree that lifts it well beyond ‘idle curiosity.’ ”).
ii. Purely Factual Information
The Court in Zauderer noted that the compelled disclosure in that case was of “purely factual and uncontroversial information.” Zauderer, 471 U.S. at 651, 105 S.Ct. 2265. The Court did not, however, require in its constitutional test that the disclosed information be “purely factual and uncontroversial.” Some lower courts have recited, without discussion, the “purely factual and uncontroversial” language as part of the Zauderer test. See, e.g., Nat’l Ass’n of Mfrs. v. S.E.C., 800 F.3d 518, 541 (D.C. Cir. 2015) (“But whatever may be the complexities of applying the standard in discrete situations, as a matter of precedent, an obligation in the commercial sphere to disclose ‘purely factual and uncontroversial’ information about a product draws deferential First Amendment review.”); Safelite Grp., Inc. v. Jepsen, 764 F.3d 258, 263 (2d Cir. 2014) (“On a cursory review, our precedent arguably supports the district court’s conclusion that this law simply requires disclosure of accurate, factual information.”); Cent. Illinois Light Co. v. Citizens Util. Bd., 827 F.2d 1169, 1173 (7th Cir. 1987) (“In Zauderer, the Court held that Ohio could constitutionally require an attorney to include in a commercial advertisement, purely factual and uncontroversial information about the terms under which the attorney’s services are available.”).
Given that the purpose of the compelled disclosure is to provide accurate factual information to the consumer, we agree that any compelled disclosure must be “purely factual.” However, “uncontroversial” in this context refers to the factual accuracy of the compelled disclosure, not to its subjective impact on the audience. This is clear from Zauderer itself. The State of Ohio required attorneys to disclose “the client’s potential liability for costs even if her suit were unsuccessful.” *1118 Zauderer, 471 U.S. at 635, 105 S.Ct. 2265. Ohio law permitted attorneys to charge clients for costs even after advertising and agreeing to represent their clients on a contingency-fee basis and losing the suit. Recognizing that the difference between fees and costs might not be apparent to prospective clients, Ohio required attorneys to disclose that a contingency fee arrangement might still require the client to pay some money to the attorney. This required disclosure was factually accurate. That the disclosure may have caused controversy, for example by discouraging customers from hiring lawyers who offered contingency-fee arrangements because they feared “hidden costs” or by harming the reputation of the lawyers who offered such fee arrangements, did not affect the constitutional analysis. What mattered was that the disclosure provided accurate factual information to the consumer. We therefore conclude that Zauderer requires only that the information be “purely factual.”
c. Application of Zauderer Test
Under Zauderer, compelled disclosure of commercial speech complies with the First Amendment if the information in the disclosure is reasonably related to a substantial governmental interest and is purely factual. The question before us is whether the speech compelled by the Berkeley ordinance satisfies this test.
i. Reasonably Related to a Substantial Governmental Interest
There is no question that protecting the health and safety of consumers is a substantial governmental interest. See, e.g., Posadas de Puerto Rico Assocs. v. Tourism Co. of Puerto Rico, 478 U.S. 328, 341, 106 S.Ct. 2968, 92 L.Ed.2d 266 (1986) (“[H]ealth, safety, and welfare constitute[ ] a ‘substantial’ governmental interest”). The federal government and Berkeley have both sought to further that interest. By adopting SAR limits on exposure to RF radiation, the FCC has furthered the interest of protecting the health and safety of cell phone users in the United States. It has done so by adopting a highly protective policy, setting low SAR limits on RF radiation and compelling cell phone manufacturers to disclose information to cell phone users that will allow them to avoid exceeding those limits. By passing its ordinance, the City of Berkeley has furthered that same interest. After finding that cell phone users are largely unaware of the FCC policy and of the information in their user manuals, the Berkeley City Council decided to compel retailers in Berkeley to provide, in summary form, the same information that the FCC already requires cell phone manufacturers to provide to those same consumers, and to direct those consumers to their user manuals for more detailed information. See Jensen Deck, Ex. A (survey) (reflecting that a majority of persons surveyed were not “aware that the government’s radiation tests to assure the safety of cell phones assume that a cell phone would not be carried against your body, but would instead be held at least 1 to 15 millimeters from your body”).
CTIA argues strenuously that radio-frequency radiation from cell phones has not been proven dangerous to consumers. Limiting itself to research published when the record was made in this case, CTIA is correct in pointing out that there was nothing then before the district court showing that such radiation had been proven dangerous. But this is beside the point. The fact that RF radiation from cell phones had not been proven dangerous was well known to the FCC in 1996 when it adopted SAR limits to RF radiation; was well known in 2013 when it refused to exclude cell phones from its rule adopting SAR limits; and was well known in 2015 when it required cell phone manufacturers to tell consumers how to avoid exceeding *1119 SAR limits. After extensive consultation with federal agencies with expertise about the health effects of radio-frequency radiation, the FCC decided, despite the lack of proof of dangerousness, that the best policy was to adopt SAR limits with a large margin of safety.
The FCC concluded that requiring cell phone manufacturers to inform consumers in their users manuals of SAR limits on RF radiation, and to tell them how to avoid excessive exposure, furthered the federal government’s interest in protecting their health and safety. The City of Berkeley concluded that consumers were largely unaware of the contents of their users manuals. Agreeing with the FCC that the information about SAR limits and methods of avoiding excessive exposure is important, Berkeley requires cell phone retailers to provide some of that same information to consumers and to direct them to their user manuals for farther details. We are not in a position to disagree with the conclusions of FCC and Berkeley that this compelled disclosure is “reasonably related” to protection of the health and safety of consumers.
ii. Purely Factual
CTIA argues that Berkeley’s compelled disclosure is not “purely factual” within the meaning of Zander er. We disagree.
For the convenience of the reader, we again provide the full text of the compelled disclosure:
The City of Berkeley requires that you be provided the following notice:
To assure safety, the Federal Government requires that cell phones meet radio-frequency (RF) exposure guidelines. If you carry or use your phone in a pants or shirt pocket or tucked into a bra when the phone is ON and connected to a wireless network, you may exceed the federal guidelines for exposure to RF radiation. Refer to the instructions in your phone or user manual for information about how to use your phone safely.
Berkeley Mun. Code § 9.96.030(A) (2015).
The text of the compelled disclosure is literally true. We take it sentence by sentence:
(1) “To assure safety, the Federal Government requires that cell phones meet radio-frequency (RF) exposure guidelines.” This statement is true. As recounted above, beginning in 1996 the federal government has set RF exposure guidelines with which cell phones must comply.
(2) “If you carry or use your cell phone in a pants or shirt pocket or tucked into a bra when the phone is ON and connected to a wireless network, you may exceed the federal guidelines for exposure to RF radiation.” This statement is also true. The FCC has established SAR limits for RF radiation, and has concluded that maintaining a certain separation between a cell phone and the user’s body protect consumers from exceeding these limits.
(3) “Refer to the instructions in your phone or user manual for information about how to use your phone safely.” This sentence is an instruction rather than a direct factual statement. However, it clearly implies a factual statement that “information about how to use your phone safely” in compliance with the FCC’s RF “exposure guidelines” “to assure safety,” may be found either in a cell phone or user manual. This implied statement, too, is true.
We recognize, of course, that a statement may be literally true but nonetheless misleading and, in that sense, untrue. That is what CTIA argues here. CTIA argues that the compelled disclosure is inflammatory and misleading, and that it is therefore not “purely factual.” CTIA bases its *1120 argument solely on the text of the ordinance.
CTIA argues that “[t]he Ordinance requires an inflammatory warning about unfounded safety risks”; that “[t]he Ordinance clearly and deliberately suggests that the federal RF energy testing guideline (the SAR limit) is the demarcation point of ‘safety for cell phones, such that ‘exposure’ to RF energy above that limit creates a safety hazard”; and that “[t]he Ordinance is misleading for the additional reason that it uses the inflammatory term ‘radiation,’ which is fraught with negative associations, in order to stoke consumer anxiety.” CTIA argues further that the phrase “RF radiation” is “fraught with negative associations,” that it is used in the compelled disclosure “in order to stoke consumer anxiety,” and that it is therefore not “purely factual.”
We read the text differently. The first sentence tells consumers that cell phones are required to meet federal “RF exposure guidelines” in order “[t]o assure safety.” Far from inflammatory, this statement is largely reassuring. It assures consumers that the cell phones they are about to buy or lease meet federally imposed safety guidelines.
The second sentence tells consumers what to do in order to avoid exceeding federal guidelines. This statement may not be reassuring, but it is hardly inflammatory. It provides in summary form information that the FCC has concluded that consumers should know in order to ensure their safety. Indeed, the FCC specifically requires cell phone manufacturers to provide this information to consumers. See “FCC Exposure Procedures” § 4.2.2(d) (“Specific information must be included in the operating manuals to enable users to select body-worn accessories that meet the minimum test separation distance requirements .... All supported body-worn accessory operating configurations must be clearly disclosed to users, through conspicuous instructions in the user guide and user manual, to ensure unsupported operations are avoided.”) (emphasis added).
The third sentence tells consumers to consult their user manuals to obtain further information — that is, to obtain the very information the FCC requires cell phone manufacturers to provide in “conspicuous instructions” in user manuals.
Further, the phrase “RF radiation,” used in the second sentence, is precisely the phrase the FCC has used, beginning in 1996, to refer to radio-frequency emissions from cell phones. See FCC Guidelines for Radio frequency Radiation at ¶ 1, supra at 9 (“radio-frequency (RF) radiation”). We do not fault Berkeley for using the term “RF radiation” when referring to cell phone emissions when it is not only the technically correct term, but also the term the FCC itself uses to refer to such emissions.
Finally, we note that the Berkeley ordinance allows a cell phone retailer to add to the compelled disclosure. If a retailer is concerned, as CTIA contends it should be, that the term “RF radiation” is inflammatory and misleading, the retailer may add to the compelled disclosure any further statement it sees fit to add. See § 9.96.030(B) (“The paper on which the notice is printed may contain other information in the discretion of the Cell phone retailer[.]”). CTIA has put nothing in the record to indicate that any Berkeley retailer has felt it necessary, or even useful, to add explanatory information about the nature of RF radiation. Nor has CTIA presented any evidence in the district court showing how Berkeley consumers have understood the compelled disclosure, or evidence showing that sales of cell phones in Berkeley were, or are likely to be, depressed as a result of the compelled disclosure.
*1121 d. Likelihood of Success
Based on the foregoing, we conclude that CTIA has little likelihood of success on its First Amendment claim that the disclosure compelled by the Berkeley ordinance is unconstitutional.
2. Preemption
a. Conflict Preemption
“Federal preemption occurs when: (1) Congress enacts a statute that explicitly preempts state law; (2) state law actually conflicts with federal law; or (3) federal law occupies a legislative field to such an extent that it is reasonable to conclude that Congress left no room for state regulation in the legislative field.” Chae v. SLM Corp., 593 F.3d 936, 941 (9th Cir. 2010) (internal quotation marks omitted). CTIA contends that Berkeley’s compelled disclosure is invalid because of conflict preemption.
“Conflict preemption is implicit preemption of state law that occurs where there is an actual conflict between state and federal law.” McClellan v. I-Flow Corp., 776 F.3d 1035, 1039 (9th Cir. 2015) (citations and internal quotation marks omitted). “When Congress charges an agency with balancing competing objectives, it intends the agency to use its reasoned judgment to weigh the relevant considerations and determine how best to prioritize those objectives. Allowing a state law to impose a different standard [impermissibly] permits a re-balancing of those objectives.” Farina v. Nokia Inc., 625 F.3d 97, 123 (3d Cir. 2010). Conflict preemption arises either when “compliance with both federal and state regulations is a physical impossibility ... or when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.” McClellan, 776 F.3d at 1039 (citations and internal quotation marks omitted). We are concerned here with “obstacle” preemption. CTIA contends that Berkeley’s compelled disclosure creates an impermissible obstacle by requiring more disclosure than is required by the FCC. See Crosby v. Nat’l Foreign Trade Council, 530 U.S. 363, 373, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000) (finding preemption where a challenged state law “stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.”) (internal quotation marks omitted).
b. Telecommunications Act of 1996
“Preemption analysis *start[s] with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.’ ” City of Columbus v. Ours Garage and Wrecker Serv., Inc., 536 U.S. 424, 438, 122 S.Ct. 2226, 153 L.Ed.2d 430 (quoting Medtronic, Inc. v. Lohr, 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996)). “Congressional intent, therefore, is the ultimate touchstone of preemption analysis.” Engine Mfrs. Ass’n v. S. Coast Air Quality Mgmt. Dist., 498 F.3d 1031, 1040 (9th Cir. 2007) (citing Tocher v. City of Santa Ana, 219 F.3d 1040, 1045 (9th Cir. 2000)).
The FCC’s organic statute is the Telecommunications Act of 1996 (“the Act”), 110 Stat. 56. Legislative hearings, as well as the Act itself, show that Congress desired “uniform, consistent requirements, with adequate safeguards of public health and safety” in nationwide telecom services. See H.R. Rep. No. 104-204, 94 (1996). The Act delegated to the FCC the authority “to ‘make effective rules regarding the environmental effects of [RF] emissions.’ ” Farina v. Nokia Inc., 625 F.3d 97, 106 (3d Cir. 2010) (quoting 110 Stat. 56, 152). Specifically, “the FCC was tasked not only with protecting the health and safety of the public, but also with ensuring the rapid development of an efficient and uniform *1122 network]].] Id. at 125. This led to the creation of the regulatory measures described supra.
The centerpiece of CTIA’s argument is that the FCC does not compel cell phone manufacturers to provide information to consumers about SAR limits on RF radiation exposure. CTIA did not make this argument in the district court. Indeed, it conceded in its briefing in the district court that the FCC did so require. See, e.g., Plaintiffs Reply in Support of Motion for a Preliminary Injunction at 12 (“The manner in which Berkeley requires CTIA’s members to deliver Berkeley’s message— at the point of sale, rather than in a user manual — also distinguishes the Ordinance from the FCC’s requirements.”) (emphasis added). CTIA made this argument for the first time in its Reply Brief in this court, and it repeated the argument during oral argument to our panel.
Because CTIA conceded the point in the district court and made its argument to the contrary only before us (and even then only in its Reply Brief and during oral argument), it is waived. See Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills, 321 F.3d 878, 882 (9th Cir. 2003) (“This issue is raised for the first time on appeal, and we therefore treat the issue as waived.”); United States v. Bohn, 956 F.2d 208, 209 (9th Cir. 1992) (“we ordinarily decline to consider arguments raised for the first time in a reply brief’). But we note that if we were to consider CTIA’s argument on the merits, we would reject it. Beginning in October 2015, the FCC required cell phone manufacturers to inform consumers of minimum separation distances in user manuals! We quoted the relevant passage, supra at 1113. For the convenience of the reader, we repeat much of the passage here:
Specific information must be included in the operating manuals to enable users to select body-worn accessories that meet the minimum test separation distance requirements. Users must be fully informed of the operating requirements and restrictions, to the extent that the typical user can easily understand this information, to acquire the required body-worn accessories to maintain compliance .... All supported body-worn accessory operating configurations must be clearly disclosed to users, through conspicuous instructions in the user guide and user manual, to ensure unsupported operations are avoided.
In re Exposure Procedures and Equipment Authorization Policies for Mobile and Portable Devices, FCC Office of Engineering and Technology Laboratory Division § 4.2.2(d) at 11 (Oct. 23, 2015) (“FCC Exposure Procedures”) (emphases added). The FCC document containing this language “is one of a collection of guidance publications referred to as the published RF exposure KDB procedures.” Id. § 1 at 1 (emphasis in original). The document specifies that “[a]pplications for equipment authorization must meet all the requirements described in the applicable published RF exposure KDB procedures.” Id. § 2 at 3 (emphasis in original). That is, in order for a cell phone to be authorized by the FCC for consumer use, it must satisfy the requirements outlined in FCC Exposure Procedures.
c. Likelihood of Success
Given the FCC’s requirement that cell phone manufacturers must inform consumers of “minimum test separation distance requirements,” and must “clearly disclose[]” accessory operating configurations “through conspicuous instructions in the user guide and user manual, to ensure unsupported operations are avoided,” we see little likelihood of success based on conflict preemption. Berkeley’s compelled disclosure does no more than to alert consumers to the safety disclosures that the *1123 FCC requires, and to direct consumers to federally compelled instructions in their user manuals providing specific information about how to avoid excessive exposure. Far from conflicting with federal law and policy, the Berkeley ordinance complements and reinforces it.
B. Irreparable Harm
Irreparable harm is relatively easy to establish in a First Amendment case. “[A] party seeking preliminary in-junctive relief in a First Amendment context can establish irreparable injury ... by demonstrating the existence of a color-able First Amendment claim.” Sammartano v. First Judicial District Court, 303 F.3d 959, 973 (9th Cir. 2002) (citation omitted), abrogated on other grounds by Winter v. Natural Res. Def. Council., 555 U.S. 7, 22, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). We nonetheless conclude that it has not been established here.
“[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.” Id. (citing Elrod v. Burns, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976)). But the mere assertion of First Amendment rights does not automatically require a finding of irreparable injury. It is the “purposeful unconstitutional suppression of speech [that] constitutes irreparable harm for preliminary injunction purposes.” Goldie’s Bookstore v. Superior Ct., 739 F.2d 466, 472 (9th Cir. 1984). We have already concluded under the Zauderer test for compelled disclosure that, on the record before us, Berkeley’s ordinance complies with the First Amendment. Sammartano, 303 F.3d at 973-74 (“[T]he test for granting a preliminary injunction is ‘a continuum in which the required showing of harm varies inversely with the required showing of meritoriousness,’ when the harm claimed is a serious infringement on core expressive freedoms, a plaintiff is entitled to an injunction even on a lesser showing of meritoriousness.”). Further, there ⅛ nothing in the record showing harm to CTIA or its members through actual or threatened reduction in sales of cell phones caused by the disclosure compelled by the ordinance.
We conclude similarly that there has been no irreparable harm based on preemption.
C. Balance of the Equities
A court must “balance the interests of all parties and weigh the damage to each” in determining the balance of the equities. Stormans, Inc. v. Selecky, 586 F.3d 1109, 1138 (9th Cir. 2009).
CTIA asserts that implementing the ordinance will cause its members substantial economic harm and violate their First Amendment rights. We have concluded that CTIA’s First Amendment claim is unlikely to succeed, and the record provides no evidence to support a finding of economic or reputational harm to cell phone retailers. However, CTIA relies on Pacific Gas & Electric Co. v. Public Utilities Commission of California, 475 U.S. 1, 15-16, 106 S.Ct. 903, 89 L.Ed.2d 1 (1986), to argue that, while disclosures may not violate the First Amendment, the ordinance imposes an “undue burden” on CTIA’s members because it creates significant “pressure to respond,” and that this pressure is “antithetical to the free discussion that the First Amendment seeks to foster.” There is no showing of any such pressure. The ordinance requires CTIA’s members to inform their customers that the FCC has promulgated regulations concerning RF emissions and to advise customers to refer to their user manuals for more information. To the extent that a cell phone retailer is dissatisfied with the disclosure as written, it can append additional *1124 disclosures. Berkeley Ordinance, § 9.96.030(C) (May 26, 2015). CTIA has put nothing in the record showing that any Berkeley cell phone retailer has felt pressured, or has sought to take advantage of the provision of the ordinance allowing it to make any additional disclosure it desires. See also Milavetz, 559 U.S. at 250, 130 S.Ct. 1324 (“not preventing ... [the] conveyance] of any additional information” is one of the essential features of a Zauderer disclosure).
Berkeley properly asserts that it has a substantial interest in protecting the health of its citizens. CTIA, on the other hand, has failed to demonstrate any hardship tipping the balance in its favor. We conclude that the balance of the equities favors Berkeley.
D. The Public Interest
“The public interest inquiry primarily addresses impact on non-parties rather than parties. It embodies the Supreme Court’s direction that[,] in exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.” Bernhardt v. Los Angeles Cty., 339 F.3d 920, 931-32 (9th Cir. 2003) (internal quotation marks and citation omitted) (citing Weinberger v. Romero-Barcelo, 456 U.S. 305, 312, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982)). We agree with the district court that an injunction would injure the public interest in having a free flow of accurate information.
“Protection of the robust and free flow of accurate information is the principal First Amendment justification for protecting commercial speech, and requiring disclosure of truthful information promotes that goal.” Nat’l Elec. Mfrs. Ass’n, 272 F.3d at 114. The district court found that while “ ‘accurate and balanced disclosures regarding RF energy are already available’ ... there is evidence that the public does not know about those disclosures.” (citing Jensen Deck, Ex. A (survey)). Because “disclosure furthers, rather than hinders ... the efficiency of the ‘marketplace of ideas,’ ” we hold that the ordinance is in the public interest and that an injunction would harm that interest. See Nat’l Elec. Mfrs. Ass’n, 272 F.3d at 114.
Conclusion
Our assessment of the probability of CTIA’s success on the merits, the likelihood of irreparable harm, the balance of the hardships, and the public interest lead us to conclude that the district court did not abuse its discretion in denying preliminary injunctive relief to CTIA. Accordingly, the district court’s order denying such relief is
AFFIRMED.