**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| NATIONWIDE BIWEEKLY ADMINISTRATION, INC., an Ohio corporation,<br><br>*Plaintiff-Appellant*,<br><br>v.<br><br>JAN LYNN OWEN, in her official capacity as Commissioner of the Department of Business Oversight for the State of California,<br><br>*Defendant-Appellee.* | No. 15-16220<br><br>D.C. No.<br>5:14-cv-05166-LHK |

| | |
|---|---|
| LOAN PAYMENT ADMINISTRATION LLC; DANIEL LIPSKY; NATIONWIDE BIWEEKLY ADMINISTRATION, INC., *Plaintiffs-Appellants*, <br><br>v.<br><br>JOHN F. HUBANKS, Deputy District Attorney, Monterey County District Attorney's Office, in his official capacity; ANDRES H. PEREZ, Deputy District Attorney, Marin County District Attorney's Office, in his official capacity; MONTEREY COUNTY DISTRICT ATTORNEY'S OFFICE, a County agency; MARIN COUNTY DISTRICT ATTORNEY'S OFFICE, a County agency, *Defendants-Appellees.* | No. 15-16253 <br><br> D.C. No. 5:14-cv-04420-LHK <br><br><br> OPINION |

Appeal from the United States District Court
for the Northern District of California
Lucy H. Koh, District Judge, Presiding

Argued and Submitted April 17, 2017
San Francisco, California

Filed October 10, 2017

Before:  Stephen Reinhardt and Marsha S. Berzon, Circuit Judges, and Ann D. Montgomery,[*] District Judge.

Opinion by Judge Reinhardt;
Dissent by Judge Montgomery

## SUMMARY[**]

### Civil Rights

The panel reversed the district court's orders dismissing two related actions pursuant to *Younger v. Harris*, 401 U.S. 37 (1971), affirmed the district court's order denying a preliminary injunction in appeal No. 15-16253, and vacated the district court's order denying a preliminary injunction in appeal No. 15-16220, and remanded.

In appeal No. 15-16253, Plaintiff Nationwide Biweekly Administration, an administrator of biweekly mortgage loan repayment programs, sought a preliminary injunction against Monterey and Marin County district attorneys to preclude enforcement of California statutes, California Business & Professions Code § 14701(a) and 14702, which required Nationwide to disclose in its mail solicitations to homeowners that it lacked authorization from lenders. Nationwide alleged that enforcement of the statutes would

---

[*] The Honorable Ann D. Montgomery, United States District Judge for the District of Minnesota, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

violate its First Amendment rights. In 15-16220, Loan Payment Administration, a subsidiary of Nationwide, sought to enjoin the enforcement of Cal. Fin. Code § 12200, et seq. (the "Prorater Law"), which required that it obtain a prorater license in order to operate in California. Plaintiffs alleged that limiting prorater licenses to California corporations violated the Dormant Commerce Clause.

After the district court denied the preliminary injunctions in each case and while the appeals from the denials were pending in this court, defendants filed a joint enforcement suit in California Superior Court against plaintiffs. The district court subsequently dismissed both cases under *Younger v. Harris*, 401 U.S. 37 (1971), and plaintiffs filed new notices of appeals from the dismissals in each case.

The panel first held that the district court erred by abstaining under *Younger* because the cases had proceeded beyond the "embryonic stage" in the district court before the corresponding state cases were filed. The panel stated that the district court had spent a substantial amount of time evaluating the merits of the cases in considering and denying Nationwide's motions for preliminary injunctions.

Turning to the merits of the preliminary injunction orders, the panel held that Nationwide was unlikely to succeed on its claim that the First Amendment precluded California from requiring it to make certain truthful disclosures in its mail solicitations. The panel held that the required disclosures are meant to protect against consumer confusion, and are therefore permissible under *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 651 (1985). The panel therefore affirmed the district court's order denying a preliminary injunction in appeal No. 15-16253.

The panel held that Nationwide was likely to succeed on its claim that the Dormant Commerce Clause precludes California from making in-state incorporation a prerequisite of licensure to engage in interstate commerce. The panel held that this form of discrimination between in-state and out-of-state economic interests was incompatible with a functioning national economy, and the prospect of each corporation being required to create a subsidiary in each state was precisely the sort of "Balkanization" that the Dormant Commerce Clause exists to prevent. The panel vacated the district court's order denying the preliminary injunction in 15-16220 and remanded both cases for further proceedings.

Dissenting, Judge Montgomery disagreed with the majority's conclusion that the first element of *Younger* abstention—ongoing state proceedings—was not satisfied in the two cases. Judge Montgomery stated that at the time the state case was filed, no proceedings of substance on the merits had taken place in either of the federal lawsuits, and that the cases remained in an embryonic stage.

**COUNSEL**

Benjamin M. Flowers (argued), Jones Day, Columbus, Ohio, for Plaintiff-Appellant Nationwide Biweekley Administration, Inc.

Amanda R. Parker (argued), Jones Day, Cleveland, Ohio; Bruce E. H. Johnson, Davis Wright Tremaine LLP, Seattle, Washington; Thomas R. Burke, Nicolas A. Jampol, and Diana Palacios, Davis Wright Tremaine LLP, San Francisco, California; for Plaintiffs-Appellants Loan Payment Administration LLC, Daniel Lipsky, and Nationwide Biweekly Administration, Inc.

Lucy F. Wang (argued), Assistant Attorney General; Joyce E. Hee, Supervising Deputy Attorney General; Diane S. Shaw, Senior Assistant Attorney General; Xavier Becerra, Attorney General; Office of the Attorney General, San Francisco, California; for Defendant-Appellee Jan Lynn Owen.

Brian Charles Case (argued), Deputy County Counsel, Office of County Counsel, County of Marin, San Rafael, California; William M. Litt, Deputy County Counsel; Charles J. McKee, County Counsel; Office of County Counsel, County of Monterey, Salinas, California; for Defendants-Appellees John F. Hubanks, Andres H. Perez, Monterey County District Attorney's Office, and Marin County District Attorney's Office.

**OPINION**

REINHARDT, Circuit Judge:

In these cases, we reaffirm the obligation of the federal courts to exercise their jurisdiction in the absence of a valid justification for not doing so. Specifically, we find that the cases had proceeded beyond the "embryonic stage" in the District Court before the corresponding state cases were filed, and therefore abstention under *Younger v. Harris*, 401 U.S. 37 (1971), was inappropriate.

Turning to the merits of the preliminary injunction motions in the cases, we conclude that Nationwide is unlikely to succeed on its claim that the First Amendment precludes California from requiring it to make certain truthful disclosures in its mail solicitations. The required disclosures are meant to protect against consumer confusion, and are therefore permissible under *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 651 (1985). The First Amendment does not generally protect corporations from being required to tell prospective customers the truth.

However, Nationwide is likely to succeed on its claim that the Dormant Commerce Clause precludes California from making in-state incorporation a prerequisite of licensure to engage in interstate commerce. This form of discrimination between in-state and out-of-state economic interests is incompatible with a functioning national economy, and the prospect of each corporation being required to create a subsidiary in each state is precisely the sort of

"Balkanization" that the Dormant Commerce Clause exists to prevent.[1]

## BACKGROUND

## I.   Nationwide's Business Model

Nationwide (which is incorporated in Ohio) and Loan Payment, as its subsidiary, advertise a product they call "biweekly interest savings" to homeowners with mortgages. Under this program, Nationwide debits half of a customer's monthly mortgage bill from his or her account every two weeks, and then sends payments to the lender on a monthly basis. Because months are slightly longer than four weeks, the effect of this is that the customer pays more on his mortgage each year than he would under a traditional monthly payment plan (approximately the equivalent of one extra monthly payment each year, or an 8% increase in yearly payments).

The portion of this extra payment that is sent to the lender goes to paying down the principal on the loan, which means that the mortgage is paid off faster than it otherwise would be. As a result, the customer pays less in total interest over the course of the loan. Nationwide characterizes this reduction in interest payments as "savings," and in fact states in one

---

[1] Loan Payment Administration LLC is a wholly owned subsidiary of Nationwide Biweekly Administration, Inc., and Daniel S. Lipsky is the sole shareholder of Nationwide. Following the approach of the parties, we refer to the plaintiffs in both cases collectively as "Nationwide." Jan Lynn Owen is sued in her official capacity as the Commissioner of the California Department of Business Oversight, and we refer to her as "the Commissioner." We refer to the defendants in 15-16253 (both individuals and entities) collectively as "the district attorneys."

solicitation letter that it "provide[s] a 100% SAVINGS GUARANTEE." However, the effect of Nationwide's program is more accurately understood as a reallocation of money across time: the customer pays more in the present in order to pay less in the future. In other words, Nationwide's calculation of the customer's "savings" simply compares the nominal total amount paid under the alternative payment plans without accounting for the customer's "discount rate"—that is, the extent to which having $10 today is more valuable than having $10 a year from today.

In effect, then, the product that Nationwide sells is a refinancing transaction that converts a standard 30-year mortgage into a slightly shorter mortgage. For instance, to use an example Nationwide cites in its brief, it might convert a 30-year mortgage into a 23.9-year mortgage. As always happens when the term of a mortgage is reduced, monthly payments increase and total interest payments decrease—just as, taking the math to the extreme, a "0-year mortgage" (that is, paying in cash) involves the highest possible initial payment but zero interest costs.

In exchange for providing what is effectively a refinancing service, Nationwide charges its customers various fees. According to the district attorneys, these include a "debit fee" of $3.50 (charged once every two weeks) as well as a "set-up" fee equal to half of the customer's monthly mortgage payment.[2] Thus, despite Nationwide's claims in its solicitation letters that "[t]he savings gained from the biweekly program goes entirely to you the customer and not

---

[2] The district attorneys allege that the set-up fee is significantly higher than is allowed under Cal. Fin. Code § 12314(a). That allegation is not before us in this case.

to the lender," and that "[p]artnering with you the customer, and not your lender, ensures that you receive 100% of the savings benefit," in fact a portion of each payment (and thus a portion of the "savings benefit") goes to paying Nationwide's debit fee and the entirety of the first extra biweekly payment (half of the "savings benefit" for the first year) goes to paying Nationwide's "set-up fee."

Nationwide's solicitation letters do not disclose the fee structure, and in fact only mention fees in a fine-print disclaimer that "savings is net of all fees." Even the longer version of Nationwide's solicitation letter, which includes an entire page of "commonly asked questions and answers," does not include any further details about the fees and in fact claims that the "two extra biweekly debits every year" are "directed 100% towards the principal of the loan" without mentioning that the first such extra debit is in fact kept by Nationwide as its "set-up fee."

## II.  The Investigation

On July 30, 2013, Nationwide received a letter from the Monterey County District Attorney's Office. According to the letter, the District Attorney's Offices for Marin and Monterey Counties were "in receipt of numerous complaints about the marketing and business practices of Nationwide Bi-Weekly Administration, Inc."[3] The letter then stated that the

---

[3] According to a sworn declaration from Lipsky, relied on in Nationwide's briefing in connection with the bad-faith exception to *Younger* abstention both in the district court and before us, the only complaint received directly by either district attorney's office was made by the spouse of a deputy district attorney in the Monterey County District Attorney's Office. Despite Nationwide raising the issue repeatedly, the

"complaints indicate a pattern of deceptive business practices having an adverse impact on California consumers." The letter went on to allege or suggest that Nationwide was violating several California laws, including (as relevant to this appeal), California Business and Professions Code §§ 14701(a) and 14702, and California Finance Code § 12200.

The first provision prohibits:

> includ[ing] the name, trade name, logo, or tagline of a lender in a written solicitation for financial services directed to a consumer who has obtained a loan from the lender without the consent of the lender, unless the solicitation clearly and conspicuously states that the person is not sponsored by or affiliated with the lender and that the

---

district attorneys have never responded to or disputed the claim. We therefore assume for purposes of this opinion that it is true.

Monterey County Deputy District Attorney John F. Hubanks's decision to characterize the spouse of an attorney in his office as simply "a Monterey County homeowner" in a sworn declaration submitted to the district court, while failing to disclose the close connection between that homeowner and his office, is certainly troubling. Although Hubanks's declaration is, strictly speaking, true, it omits facts material to the district attorneys' arguments in the district court that the "numerous complaints filed against Nationwide Biweekly" were "evidence that the solicitations and marketing of Nationwide Biweekly is misleading to consumers." As the district attorneys note, they are "officers of the court." In light of that position, we expect them to be candid and forthcoming with material facts, particularly because they are prosecutors whose jobs are to "protect[] the public." However, the bad faith issue does not ultimately affect our resolution of this case.

solicitation is not authorized by the lender, which shall be identified by name. This statement shall be made in close proximity to, and in the same or larger font size as, the first and the most prominent use or uses of the name, trade name, logo, or tagline in the solicitation, including on an envelope or through an envelope window containing the solicitation.

Cal. Bus. & Prof. Code § 14701(a).

The second provision prohibits

includ[ing] a consumer's loan number or loan amount, whether or not publicly available, in a solicitation for services or products without the consent of the consumer, unless the solicitation clearly and conspicuously states, when applicable, that the person is not sponsored by or affiliated with the lender and that the solicitation is not authorized by the lender, and states that the consumer's loan information was not provided to that person by that lender. This statement shall be made in close proximity to, and in the same or larger font as, the first and the most prominent use or uses of the consumer's loan information in the solicitation, including on an envelope or through an envelope window containing the solicitation.

*Id.* § 14702. With regard to both these provisions, the district attorneys accused Nationwide of including lenders' names

and the consumers' loan numbers and loan amounts in its solicitations without the required disclosures.

The third provision prohibits (in relevant part) "acting as a prorater . . . without first obtaining a license from the commissioner." Cal. Fin. Code § 12200. A "prorater" is defined as "a person who, for compensation, engages in whole or in part in the business of receiving money or evidences thereof for the purpose of distributing the money or evidences thereof among creditors in payment or partial payment of the obligations of the debtor." *Id.* § 12002.1. The district attorneys' letter indicated that "Nationwide may be in violation" of the prohibition by acting as a prorater without a license. However, a license to engage in this activity is available to a corporation only if the corporation is "organized under the laws of this State for that purpose." *Id.* § 12200.1. Thus, the statute requires that corporations seeking a California prorater license be both (1) incorporated in California and (2) organized for the purpose of offering prorating services.

Over the ensuing months, Nationwide provided documents to the district attorneys and met with them twice. The negotiations broke down, and on October 1, 2014, the Monterey County District Attorney emailed Nationwide's attorneys that "Nationwide and Mr. Lipsky have had ample opportunity to meet and communicate with us about their defenses and explanations," and that accordingly the district attorneys were "done with the games." The district attorneys then asked Nationwide's attorneys if they were "still authorized to accept service of process on behalf of Mr. Lipsky and Nationwide."

Three weeks later, on October 21, 2014, the Commissioner (who had been notified of Nationwide's activities by the district attorneys) sent a letter to Nationwide's counsel "notify[ing] Nationwide that an investigation is currently underway by the Department's Enforcement Division regarding possible unlicensed business activity by Nationwide in California."

## III.    The Federal Proceedings

On October 2, 2014—the day after receiving the email from the district attorneys regarding service of process—Nationwide filed suit in the Northern District of California seeking declaratory and injunctive relief to prevent the district attorneys from enforcing California Business & Professions Code §§ 14701(a) and 14702 against Nationwide. According to the complaint, enforcement of the statutes would violate Nationwide's First Amendment rights and, in the alternative, Nationwide qualified for a state-law exemption from the statutes.[4]

On November 21, 2014—one month after receiving the Commissioner's letter—Nationwide filed another federal complaint, also in the Northern District of California, seeking injunctive and declaratory relief to prevent the Commissioner from enforcing California Financial Code § 12200 against Nationwide. The complaint alleged that limiting prorater

---

[4] The complaint also alleged a cause of action under the California Constitution. Nationwide did not raise its state constitutional claim on appeal.

licenses to California corporations violates the Dormant Commerce Clause.[5]

In both cases (which were assigned to the same district judge), Nationwide filed motions for preliminary injunctions on the day the complaints were filed. The details of the procedural history of each case then diverged slightly, though each case involved the same general steps: the filing of various motions to dismiss; the briefing of the motions for preliminary injunctions and non-*Younger*-related motions to dismiss; the denial of the preliminary injunctions; the appeal of those denials; and then dismissal under *Younger* after the state case was filed.[6]

## A.  The First Amendment Case

On October 22, 2014—three weeks after the complaint in the First Amendment case was filed—the district attorneys filed a motion to dismiss based on a deficiency in service of process. The parties reached an agreement regarding service (in exchange for a stipulated extension of time), and the motion was denied as moot.

Then, on December 30, 2014, the district attorneys filed (1) their opposition to the motion for a preliminary injunction, (2) an anti-SLAPP motion to dismiss the case, and

---

[5] The complaint also alleged causes of action under the Fourteenth Amendment based on substantive due process, vagueness, and equal protection. Nationwide did not rely on any of these claims in its motion for a preliminary injunction; they are therefore irrelevant to this appeal.

[6] We refer to the first case filed by Nationwide (that is now before us as 15-16253) as the "First Amendment case" and the second case (that is now before us as 15-16220) as the "Dormant Commerce Clause case."

(3) a motion to dismiss for (a) failure to join a necessary party (the State of California), (b) joinder of improper parties, (c) prudential ripeness, (d) *Pullman* abstention, and (e) failure to state a claim. Together with these motions the district attorneys submitted declarations, documentary evidence, and a request for judicial notice. In late January and early February Nationwide responded to the district attorneys' motions and replied to their opposition to the motion for a preliminary injunction, including submitting further declarations and evidence. The district attorneys filed replies in support of their motions to dismiss in February as well. In early March, the parties filed a joint case management statement.

On March 17, 2015, the district court denied Nationwide's motion for a preliminary injunction. The district court's written order addressed each of the factors under *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008): (1) likelihood of success on the merits, (2) likelihood of irreparable harm, (3) the balance of the equities, and (4) the public interest.

The district court started by considering the merits of Nationwide's claims. First, the district court determined that *Zauderer* applies because the California statute "require[s] a party to disclose additional factual information" and "has the goal of dissipat[ing] the possibility of consumer confusion or deception," and because the required disclosures related to Nationwide's own business, not its competitors. Thus, the district court held, the statute would survive as long as it was "reasonably related to the State's interest in preventing deception of consumers." *Zauderer*, 471 U.S. at 651.

Second, the district court concluded that the California statute is likely to survive *Zauderer* review because (a) the statute was "passed with the goal of prevent[ing] the deceptive use of lenders' trade names in consumer solicitations" and "bears a reasonable relationship to" that goal, and (b) the statute is not "unduly burdensome." The district court also considered and rejected Nationwide's argument that the statute prohibits the publication of publicly-available information, finding instead that it merely requires additional disclosures.

Third, the district court considered and rejected, after a detailed discussion, Nationwide's arguments that it qualified for an exemption from the statute under state law.

Having concluded that Nationwide was unlikely to succeed on the merits of any of its claims, the district court quickly disposed of Nationwide's arguments regarding irreparable harm, balance of the equities, and the public interest, all of which depended on the premise that the statute infringed on Nationwide's constitutional rights.

Nationwide filed a Notice of Appeal from the denial of the preliminary injunction the very next day, and filed its initial appellate brief the next month.

**B.  The Dormant Commerce Clause Case**

On January 9, 2015, the Commissioner responded to Nationwide's motion for a preliminary injunction in the Dormant Commerce Clause case, filed evidentiary objections, and moved to dismiss the case based on (a) standing, (b) ripeness, and (c) failure to state a claim. These filings were accompanied by a request for judicial notice. In

February and early March, the parties filed further responses and replies. On March 5, 2015, the parties filed a joint case management statement.

On March 18, 2015—the day after its order denying the preliminary injunction in the First Amendment case—the district court issued a detailed order denying the preliminary injunction in the Dormant Commerce Clause case as well. In this order, the district court again addressed each of the *Winter* factors.

The district court again started by considering the merits of Nationwide's Dormant Commerce Clause claim. First, the district court concluded that the California statute does not facially discriminate against interstate commerce because "an out-of-state corporation could comply with Financial Code § 12200.1 by incorporating an in-state subsidiary to apply for a prorater license" and "any company, regardless of where that company is based, that wishes to apply for a prorater license must first organize a corporation or subsidiary that has the purpose of being a prorater under the laws of California."

Second, the district court concluded that the statute did not have the practical effect of discriminating against interstate commerce because "Nationwide has not adduced 'substantial evidence'—or any evidence—that Financial Code § 12200.1" has a distorting effect on the share of the market controlled by in-state versus out-of-state corporations.

Having found that Nationwide was unlikely to succeed on the merits of its Dormant Commerce Clause claim, the district court again quickly disposed of the irreparable harm, balance of the equities, and public interest factors on that basis.

Nationwide filed a Notice of Appeal two days after the district court's order, and filed its initial appellate brief the following month.

## IV.     The State Case and the *Younger* Dismissals

About a month after the opening appellate briefs were filed, on May 15, 2015 (approximately seven months after Nationwide filed the First Amendment case against the district attorneys and almost six months after Nationwide filed the Dormant Commerce Clause case against the Commissioner), the district attorneys and the Commissioner filed a joint enforcement suit in California Superior Court against Nationwide.[7]

That same day, the district attorneys moved to dismiss the First Amendment case on *Younger* grounds. The district court then requested additional briefing regarding whether the Dormant Commerce Clause case should also be dismissed under *Younger*. On June 17, 2015, the district court dismissed both cases under *Younger*.[8] The district court reasoned that both cases were still in their "infancy" because the district court "ha[d] not granted injunctive relief, conducted

---

[7] The joint enforcement suit was brought in the name of the People of the State of California. In addition to the Commissioner and the district attorneys, the Alameda County District Attorney (who is not named in either of the federal cases) is listed as counsel for the State.

[8] At the same time, in the First Amendment case, the district court denied as moot the district attorneys' anti-SLAPP motion and their initial motion to dismiss on other grounds. In the Dormant Commerce Clause case, the district court treated the *Younger* argument as part of the initial motion to dismiss and did not address the other grounds for dismissal raised by the Commissioner.

evidentiary hearings, held case management conferences, or even set a case schedule." The district court also rejected Nationwide's arguments that an exception to *Younger* should apply based on the district attorneys' and Commissioner's alleged bad faith.

Nationwide filed new Notices of Appeal from the dismissals in each case. In light of the dismissals and the merger of all issues into the appeals from the final judgments, this court dismissed the preliminary injunction appeals, in one instance as "merged" and in the other as moot.

## STANDARD OF REVIEW

We review a district court's decision to abstain under *Younger* de novo and do not defer to the view of the district judge. *Gilbertson v. Albright*, 381 F.3d 965, 982 n.19 (9th Cir. 2004) (en banc). "We review [a] district court's denial of a preliminary injunction for abuse of discretion." *Planned Parenthood Ariz., Inc. v. Humble*, 753 F.3d 905, 911 (9th Cir. 2014). "Reliance on an erroneous legal standard is an abuse of discretion." *Id.* (quotation marks omitted).

## DISCUSSION

### I.  *Younger* Abstention

Federal courts have a "virtually unflagging obligation" to exercise the jurisdiction vested in them by Congress. *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976). However, interests of comity and federalism instruct us to abstain from exercising our jurisdiction in certain circumstances when we are asked to enjoin ongoing state enforcement proceedings. *See Younger*, 401 U.S. at

43–45. *Younger* "abstention remains an extraordinary and narrow exception to the general rule that federal courts 'have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given.'" *Potrero Hills Landfill, Inc. v. Cty. of Solano*, 657 F.3d 876, 882 (9th Cir. 2011) (quoting *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 358 (1989)).

Specifically, we must abstain in deference to state civil enforcement proceedings that: "(1) are ongoing, (2) are quasi-criminal enforcement actions or involve a state's interest in enforcing the orders and judgments of its courts, (3) implicate an important state interest, and (4) allow litigants to raise federal challenges." *ReadyLink Healthcare, Inc. v. State Comp. Ins. Fund*, 754 F.3d 754, 759 (9th Cir. 2014). In this case, Nationwide concedes that the second, third, and fourth *Younger* requirements are satisfied and disputes only whether state proceedings were "ongoing" within the meaning of *Younger*. Nationwide is correct that the state proceedings were not "ongoing" at the relevant time, and that the district court therefore erred in dismissing both cases under *Younger*.**[9]**

State proceedings are "ongoing" if they are initiated "before any proceedings of substance on the merits have taken place in the federal court." *Hicks v. Miranda*, 422 U.S. 332, 349 (1975). Put another way, "[t]he commencement of state proceedings only ceases to require federal abstention after the federal court proceedings have moved beyond an 'embryonic stage.'" *Hoye v. City of Oakland*, 653 F.3d 835, 844 (9th Cir. 2011) (quoting *Doran v. Salem Inn, Inc.*,

---

**[9]** Nationwide also argues that certain exceptions to *Younger* abstention should apply. Because we conclude that the "ongoing" prong is not met, we do not reach the possible exceptions.

422 U.S. 922, 929 (1975)). If, however, proceedings of substance on the merits have occurred in federal court, abstention is inappropriate because "[w]here a federal plaintiff seeks relief not from past state actions but merely from prospective enforcement of state law, federal court adjudication would not interfere with the state's basic executive functions in a way *Younger* disapproves." *Potrero Hills Landfill*, 657 F.3d at 885. In such cases, "considerations of economy, equity, and federalism counsel against *Younger* abstention." *Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 238 (1984).

The Supreme Court's cases, as well as our own, have created some bright-line rules regarding what proceedings are "substantial" and "on the merits" for *Younger* purposes. For instance, denial of a temporary restraining order is not a proceeding of substance on the merits. *See Hicks*, 422 U.S. at 337, 349;[10] *Fresh Int'l Corp. v. Agric. Labor Relations Bd.*, 805 F.2d 1353, 1358 n.5 (9th Cir. 1986). On the other hand, the grant of a preliminary injunction is always a proceeding of substance on the merits. *See Midkiff*, 467 U.S. at 238.

When such a bright-line rule does not apply, we must conduct a fact-specific assessment of the circumstances in individual cases. In particular, when the proceedings involve something more than a cursory denial of a temporary restraining order, but less than a grant of a preliminary injunction, we have considered in detail the history of the specific case. For instance, we have held that an "extended evidentiary hearing on the question of a preliminary

---

[10] Contrary to the dissent's contention, there is a substantial functional distinction between the denial of a temporary restraining order and the denial of a preliminary injunction.

injunction constituted a substantive proceeding on the merits," even though the preliminary injunction was not ultimately granted. *Adultworld Bookstore v. City of Fresno*, 758 F.2d 1348, 1350–51 (9th Cir. 1985).

The relevant inquiry, in examining the history of the case, is the extent of the district court's involvement in the merits. Among the factors that we have considered in this fact-specific inquiry are the time that the district court has spent considering the case, any motions ruled on, any discovery, the number of conferences held, and any change in the parties' positions as a result of the federal litigation. For example, in *Hoye*, we held that proceedings of substance on the merits had occurred when the federal case "had begun nearly six months before the commencement of criminal proceedings in state court," the district court "had denied Hoye's motion for a temporary restraining order, it had held four status conferences and hearings in [the] case," and the district court's skepticism regarding the constitutionality of the defendant city's statute "had resulted in a significant change in the relative positions of the parties." *Hoye*, 653 F.3d at 844. In *Fresh International*, we held that no proceedings of substance on the merits had occurred because "[n]o discovery took place, no hearings were held, and no motions were filed." *Fresh Int'l*, 805 F.2d at 1358 n.5.

In the two cases before us, *Younger* abstention is inappropriate because, before the date that the state case was filed, the district court had already conducted proceedings of substance on the merits. First, and most important, the district court spent a substantial amount of time evaluating the merits of the cases in considering and denying (in a detailed and reasoned order) Nationwide's motions for preliminary injunctions. Rather than denying the motions on a non-merits

ground—such as ripeness, standing, or one of the non-merits *Winter* factors—the district court devoted a substantial part of its reasoning to the likelihood of Nationwide's success on the merits. The district court issued a twenty-nine page order denying the preliminary injunction in the First Amendment case (thirteen pages of which were devoted to the legal discussion of the merits) and a twenty-page order in the Dormant Commerce Clause case (eight pages of which were devoted to the legal discussion of the merits). In addition, the district court considered the allegations and evidence submitted in each case and discussed the facts relevant to the merits of the claims.

To rule on the motions for preliminary injunctions, the district court "considered the submissions of the parties and the relevant law." Those submissions included more than 100 pages of briefing and more than 250 pages of declarations, affidavits, and exhibits in support of the motions. In its orders, the district court cited nineteen cases related to the merits of the First Amendment case and twenty-two cases related to the merits of the Dormant Commerce Clause case. This significant expenditure of effort by the federal court counsels against abstaining in deference to subsequently-initiated state cases.

In addition to the motions for preliminary injunctions, the record also demonstrates that the district court had spent time considering the Commissioner's non-*Younger*-related motion to dismiss in the Dormant Commerce Clause case. The motion to dismiss raised issues relating to the merits: namely whether Nationwide had raised cognizable claims under the Commerce Clause, substantive due process, equal protection, or the doctrine of vagueness. Although the district court had not yet ruled on the motion, it had informed the parties that it

was prepared to issue an order on the motion without a hearing. This indicates that the district court had already considered the approximately 61 pages of briefing on that motion. This additional involvement by the district court in the merits of the Dormant Commerce Clause case further weighs against *Younger* abstention.[11]

The amount of time the federal cases had been pending prior to the state case being filed (approximately seven months in the First Amendment case and six months in the Dormant Commerce Clause case) also weighs against *Younger* abstention. Although a case may remain in the "embryonic stage" for a long time in certain circumstances, *see Forty One News, Inc. v. Cty. of Lake*, 491 F.3d 662, 666 (7th Cir. 2007), we still consider the length of time (together with the rest of the facts) in determining whether *Younger* abstention is appropriate, *see Hoye*, 653 F.3d at 844 (holding that abstention was inappropriate in part because six months elapsed between filing of the federal case and filing of the state case).

We also note, although it does not affect our decision, that appeals to our court had already been filed in these cases, and briefing had already begun, before the state cases were filed. The fact that denials of preliminary injunctions, unlike denials of temporary restraining orders, are appealable indicates that Congress and the federal courts treat denials of preliminary injunctions as significant decisions. *See*

---

[11] The Commissioner argues that pleadings filed by the parties are irrelevant, because what matters is the district court's involvement in the case. However, the district court's review of pleadings is a form of involvement by the court in the merits, even when the district court has not yet issued an order resolving the motions.

28 U.S.C. § 1292; *Bennett v. Medtronic, Inc.*, 285 F.3d 801, 804 (9th Cir. 2002); *Washington v. Trump*, 847 F.3d 1151, 1158 (9th Cir. 2017). It would be at least odd to label a case "embryonic" when it has already progressed to a second level of the federal judiciary.

Considering all of these factors, and particularly the district court's detailed engagement with the merits of the cases during its consideration of the motions for preliminary injunctions, we conclude that proceedings of substance on the merits had occurred in each federal case prior to the state case being filed. Therefore, the district court's decisions to abstain under *Younger* were erroneous.

## II. Denials of the Preliminary Injunctions

We now address the district court's denials of the motions for preliminary injunctions. In order to obtain a preliminary injunction, a party must establish (1) "that [it] is likely to succeed on the merits," (2) "that [it] is likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips in [its] favor," and (4) "that an injunction is in the public interest." *Winter*, 555 U.S. at 20.

As an initial matter, we conclude that the denials are properly before us in these appeals. We then conclude that the district court properly denied the preliminary injunction in the First Amendment case on the primary ground that Nationwide is unlikely to succeed on the merits of its First Amendment claim. However, the district court erred in denying the preliminary injunction in the Dormant Commerce Clause case because it rested its decision on an erroneous interpretation of the relevant law.

## A.  Merger of the Appeals

When a case is dismissed while an appeal of an order on a preliminary injunction is pending, the preliminary injunction order "merges" into the final judgment. *See SEC v. Mount Vernon Memorial Park*, 664 F.2d 1358, 1361–62 (9th Cir. 1982). We originally applied the merger doctrine when the final judgment was on the merits and in favor of the same party that prevailed on the preliminary injunction motion, because "[t]o attempt to review the district court's advance assessment of probabilities of plaintiff's success when the district court has now found in favor of plaintiffs on the merits seems a futile exercise." *Id.* at 1361 (quoting *United States v. City of Chicago*, 534 F.2d 708, 712 (7th Cir. 1976)). However, we have since applied it in situations analogous to the one before us, when the district court denied a preliminary injunction and also dismissed the case on a non-merits ground. *See Evans v. Shoshone-Bannock Land Use Policy Comm'n*, 736 F.3d 1298, 1301 & n.4 (9th Cir. 2013) (holding that the denial of the preliminary injunction merged into the final judgment when the district court granted a motion to dismiss based on a failure to exhaust tribal remedies).

Applying the merger doctrine in this circumstance makes sense. If the cases had been properly dismissed on *Younger* grounds, there would be no need to reach the merits of the preliminary injunctions. In that case, any decisions on the preliminary injunction appeals would have been merely advisory. Those appeals were therefore properly dismissed at the time they were considered. However, now that we have decided that *Younger* abstention was inappropriate, we must decide whether the preliminary injunctions were properly denied or else the district court's decisions would be insulated

from any appellate review. Remand to the district court would serve no purpose as the district court would simply re-issue the decisions it had already reached. The merger doctrine established by our precedent effectively avoids this redundancy. We therefore turn to the merits of the denials of the preliminary injunctions.[12]

## B.  The First Amendment Case

In the First Amendment case, Nationwide sought a preliminary injunction against the district attorneys to preclude enforcement of the statutes requiring it to disclose its lack of authorization from lenders. Nationwide based its motion on the First Amendment and exemptions in the statute. We agree with the district court that a preliminary injunction was not warranted under either of those claims.

### 1.  The First Amendment

"The First Amendment, as applied to the States through the Fourteenth Amendment, protects commercial speech from unwarranted governmental regulation." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 561 (1980). However, as the Supreme Court has repeatedly affirmed, "[t]he Constitution . . . accords a lesser protection to commercial speech than to other constitutionally guaranteed expression." *Id.* at 562–63. As a result, the Court

---

[12] The district attorneys argue that the appeal of the denial of the preliminary injunction is moot because Nationwide has "*changed* the form of preliminary relief that [it is] seeking." However, Nationwide sought below to enjoin the defendants "from enforcing, attempting to enforce, or threatening to enforce" the statutes. Nationwide's requested relief below clearly encompasses an injunction against continuing enforcement, not just against initiating enforcement.

has held that states can restrict commercial speech if (1) the state has "a substantial interest to be achieved by restrictions on commercial speech," (2) "the regulatory technique [is] in proportion to that interest," and (3) the "limitation on expression" is "designed carefully to achieve the State's goal." *Id.* at 564.

Compelled disclosures to counteract potentially misleading commercial speech are subjected to even less scrutiny. "[T]he government may compel truthful disclosure in commercial speech as long as the compelled disclosure is 'reasonably related' to a substantial governmental interest." *CTIA—The Wireless Ass'n v. City of Berkeley*, 854 F.3d 1105, 1115 (9th Cir. 2017); *see also Zauderer*, 471 U.S. at 651. One such governmental interest—the one that applies in this case—is "preventing deception of consumers." *Milavetz, Gallop & Milavetz v. United States*, 559 U.S. 229, 250 (2010) (quotation marks omitted). Mandatory disclosures must also be "purely factual and uncontroversial" and not "unduly burdensome." *Zauderer*, 471 U.S. at 651. "'[U]ncontroversial' in this context refers to the factual accuracy of the compelled disclosure, not to its subjective impact on the audience." *CTIA*, 854 F.3d at 1117. Thus, a disclosure may be "purely factual and uncontroversial" although it disturbs the party being compelled to make the disclosure or disturbs its customers, including if it "discourag[es] [the latter] from" purchasing the product or service at issue or "harm[s] the reputation" of the entity that previously benefitted from the misleading advertising. *Id.* at 1118.

Nationwide argues that the Supreme Court's recent decision in *Reed v. Town of Gilbert*, 135 S. Ct. 2218 (2015), undermines both *Central Hudson* intermediate scrutiny and

*Zauderer* rational basis review, and that all content-based restrictions (or compelled disclosures) of commercial speech are now subject to strict scrutiny.[13] Nationwide is incorrect. *Cf. Retail Dig. Network, LLC v. Prieto*, No. 13-56069, 861 F.3d 839, 846 (9th Cir. 2017) (en banc) ("[T]he Supreme Court repeatedly has declined to . . . fundamentally alter *Central Hudson*'s intermediate scrutiny standard.").

*Reed* involved challenges to three categories of exemptions from a municipal sign code: ideological signs, political signs, and signs directing people to any "assembly, gathering, activity, or meeting sponsored, arranged, or promoted by a religious, charitable, community service, educational, or other similar non-profit organization." *Id.* at 2224–25. *Reed* did not relate to commercial speech, or mandatory disclosures as a part of commercial speech, and therefore did not have occasion to consider those doctrines. Further, Justice Breyer's concurrence assumed that the Court's "subcategories and exceptions" to the strict scrutiny rule, including commercial speech doctrine, would survive *Reed*, and the majority said nothing to dispute that point. *Id.* at 2235 (Breyer, J., concurring in the judgment). Confucius once said, "[t]he hardest thing of all is to find a black cat in a dark room, especially if there is no cat." Although Nationwide struggles mightily to find a new First

---

[13] In its supplementary briefing, Nationwide appears to abandon the argument that *Reed* requires us to subject the statute to strict scrutiny. However, because Nationwide does not do so explicitly, we still consider the argument out of an abundance of caution.

Amendment principle between the lines of *Reed*, there is simply nothing there to find.**[14]**

We must therefore determine whether to scrutinize the California disclosure statutes under *Central Hudson* or *Zauderer*. Nationwide offers two arguments for why *Zauderer* does not apply: (1) the required "disclosures" are, in essence, free advertising for Nationwide's competitors' products; and (2) the required disclosures are deceptive and misleading and hence not "purely factual and uncontroversial." We reject both of these arguments.

First, Nationwide argues that we should not apply *Zauderer* because the required disclosures are about the lenders' products and thus "are highly likely to further convey protectionist, rather than consumer information, goals." *Safelite Group, Inc. v. Jepsen*, 764 F.3d 258, 264 (2d Cir. 2014). *Safelite* is not relevant to this case. The law at issue in *Safelite* required insurance representatives to identify a non-affiliated repair shop whenever they provided customers with the name of a repair shop owned by the insurance company. *Id.* at 260. The law, in other words,

---

**[14]** The one district court case that Nationwide identified as applying *Reed* to commercial speech nevertheless proceeded to analyze the relevant restriction under *Central Hudson*'s intermediate scrutiny test rather than applying strict scrutiny. *See Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 128 F. Supp. 3d 597, 613–15 (E.D.N.Y. 2015). On appeal, the Second Circuit took the same approach. *See Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 112 (2d Cir. 2017). The Second Circuit's decision to apply *Central Hudson* does not conflict with our decision to apply *Zauderer* because the Second Circuit's case involved a restriction of commercial speech, *id.* at 112–13, while the present case involves a compelled disclosure rather than a restriction.

required certain businesses to provide free advertising for their competitors. In contrast, the disclosures at issue in this case cannot be construed as advertising the lenders' services. All that they say is that the lenders have not authorized Nationwide's solicitation, which conveys no information about services the lender may or may not offer.[15] The district court therefore correctly concluded that the statutes "do not require Nationwide to disclose any information about a competitor."

Second, Nationwide argues that the required disclosures are not purely factual and uncontroversial and that they are instead misleading. According to Nationwide, requiring it to "state multiple times on its Offer Letters and envelopes that its services were not 'authorized by the lender' . . . suggests that lenders have some authority to permit or not permit the Offer Letters or Nationwide's competing services, which they do not." Nationwide's argument mischaracterizes the statutes, which require it to disclose that its *solicitations* are not authorized by the lender, not that its *services* are not authorized. *See* Cal. Bus. & Prof. Code §§ 14701(a), 14702. Moreover, the required disclosures do not bear the interpretation Nationwide attempts to place on them. Saying that a solicitation is not authorized by a particular person does not imply that the solicitation is therefore unlawful or improper. The mere fact that a corporation can conjure up a possibly negative connotation of a word in a disclosure does not make the disclosure nonfactual. *See CTIA*, 854 F.3d at

---

[15] In fact, the California statutes do not require Nationwide to say *anything* about the lender. On the contrary, Nationwide's obligation to disclose the lack of authorization for its solicitations is only triggered by Nationwide's choice to mention the lender's name or details about the loan. *See* Cal. Bus. & Prof. Code §§ 14701(a), 14702.

1120 (rejecting argument that disclosure was nonfactual because "the phrase 'RF radiation' is 'fraught with negative associations'").[16]

In fact, despite complaining about the term "authorized," Nationwide admits in its brief that it already uses almost identical language: "At the bottom of every version of the Offer Letters, Nationwide states that it is '*not affiliated, connected, or associated with, sponsored, or approved* by the lender listed above,' or equivalent language." Nationwide cannot credibly hold out this disclaimer as evidence that it is already providing potential customers with accurate information while also claiming that the required disclosures are misleading. We cannot discern any meaningful difference between not being "approved" by a lender and not being "authorized" by one that would make the former accurate and the latter misleading.[17]

---

[16] We recently held that a required disclosure regarding the alleged health risks of sugary soda was "controversial" under *Zauderer* because it "convey[ed] the message that sugar-sweetened beverages contribute to [certain] health conditions regardless of the quantity consumed or other lifestyle choices," which was "contrary to statements by the FDA." *Am. Beverage Ass'n v. City and County of San Francisco*, No. 16-16072, __ F.3d __, 2017 WL 4126944, *7 (9th Cir. Sept. 19, 2017). In contrast, as we explain, the required disclosures here are not contrary to any established facts or applicable governmental policies and thus do not convey any controversial or inaccurate message.

[17] Nationwide argues that "authorized" implies a grant of formal authority while "approved" merely means informal affirmation, relying on two district court opinions. *See Fox Broad. Co. v. Dish Network LLC*, 160 F. Supp. 3d 1139, 1179 (C.D. Cal. 2015); *McCollester v. Keene*, 514 F. Supp. 1046, 1049 (D.N.H. 1981), *rev'd on other grounds*, 668 F.2d 617 (1st Cir. 1982). Nationwide's attempt to parse the words so finely based on two non-binding opinions is not convincing, particularly because we are concerned here with how the words would be interpreted by

Nationwide next argues that even if *Zauderer* applies, the statutes are unconstitutional because they are unduly burdensome and "effectively prevent the Offer Letters from conveying their message." Nationwide offers little more than conclusory statements to that effect. We cannot, on that basis, conclude that the district court erred when it found that the law required Nationwide to make only "relatively brief disclosures" in letters that "span one to two full pages of text." All mandatory disclosures impose some burden on commercial speech. A disclosure is "unduly burdensome" when the burden "effectively rules out" the speech it accompanies. *Ibanez v. Fla. Dep't of Bus. & Prof'l Regulation, Bd. of Accountancy*, 512 U.S. 136, 146 (1994). In this case, the required disclosures are reasonable and not disproportionate. They clearly do not rule out Nationwide's ability to send its solicitation letters, effectively or otherwise. They are therefore not unduly burdensome.

Finally, Nationwide argues that the disclosure requirements fail *Zauderer* review because "they are not reasonably related to the asserted interest in preventing

---

ordinary people. Nor does Nationwide's citation to the MacMillan Dictionary for the proposition that "unauthorized" means "not officially or legally allowed" support its case once one notices the example usage that dictionary provides: "the new unauthorized biography of the president." *See* http://www.macmillandictionary.com/us/dictionary/ame rican/unauthorized. An "unauthorized biography" is obviously not "disreputable or even illegal." It is true that *some* unauthorized acts are unlawful by reason of the lack of authorization. But then again, unapproved can also mean unlawful or unallowed, as with unapproved transactions and unapproved drugs. As is so often true with language, context is crucial. In the context of the solicitations and the required disclosures, we discern no risk of consumers being led to believe that the solicitations are unlawful or inappropriate merely because they are "unauthorized" by the lenders.

consumer deception."[18] However, we have no difficulty in concluding that the disclosure requirements have a relationship to preventing deception. Including a lender's name or a loan number or amount in a solicitation to provide financial services relating to the loan could, in many circumstances, lead a consumer to believe that the solicitation relates to a service offered by the lender or an affiliated party rather than an entirely separate entity. For instance, consumers may not realize that information about their loan and lender is publicly available, and thus assume that the lender has provided the information to the solicitor. In addition, when the solicitation does not clearly explain the additional charges for the service (as Nationwide's solicitations do not), a reasonable consumer might think that free financial services must be coming from the existing lender rather than a third party with nothing to gain.

Nationwide also argues that the disclosure requirements are not reasonably related to preventing deception because the other disclosures Nationwide already includes are adequate. Even if it were true that Nationwide's alternative disclosures were sufficient to prevent deception, that would not mean that the statute fails *Zauderer* review. It is not necessary to show that any particular solicitation is actually deceptive before disclosure is required. Rather, in the interest of administrative simplicity, the state may reasonably decide to require disclosure for a class of solicitations that it determines pose a risk of deception. Nationwide's proposed rule would require a more costly and uncertain adjudication of the deceptiveness

---

[18] As noted above, compelled disclosures may relate to "any governmental interest . . . so long as it is substantial." *CTIA*, 854 F.3d at 1117. The relevant interest the district attorneys have relied on in this case is the interest in preventing consumer deception.

of particular advertisements in each case before disclosure could be required. California reasonably rejected such an unwieldy case-by-case approach in favor of a bright-line rule.[19]

It was reasonable for California to determine that use of a lender's name in solicitations of this type poses a risk of consumer deception. The required disclaimers—short, accurate, and to the point—are reasonably related to California's interest in preventing that deception. Therefore, the district court correctly concluded that Nationwide was unlikely to succeed on the merits of its First Amendment challenge.

### 2.  Exemptions under State Law

In addition to its First Amendment claim, Nationwide argues that it is exempt from the disclosure requirements under exemptions written into the statute for (1) "comparison of like services or products" and (2) "nominative fair use." Cal. Bus. & Prof. Code § 14703.

The district court found that Nationwide was unlikely to succeed on the merits of its statutory argument and denied the request for an injunction primarily on that basis. We need not and do not reach Nationwide's likelihood of success on the merits of this claim. Although the statutory argument is

---

[19] Nationwide also argues for the first time in its supplementary briefing that the statute's requirements relating to font size and the location of the disclaimers independently fail to be reasonably related to preventing deception. Nationwide did not raise these arguments below; so they are waived. *See In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 992 (9th Cir. 2010).

entirely distinct from the First Amendment theory, Nationwide addresses it in conjunction with the constitutional claim. Most important, Nationwide's arguments for the remaining three prongs of injunctive relief—irreparable harm, the balance of the equities, and the public interest—are all based, illogically, entirely on the premise that enforcing the statute against Nationwide would infringe on its constitutionally protected speech.[20] Nationwide offers no explanation for doing so and offers no independent argument that it should otherwise prevail on the three latter prongs. Accordingly, given our conclusion that Nationwide is unlikely to succeed on the merits of its First Amendment claim, it is not entitled to a preliminary injunction on the basis of its statutory claim whether or not it is likely to succeed on the merits of that argument.

We therefore affirm the district court's denial of the preliminary injunction in the First Amendment case.

## C.  The Dormant Commerce Clause Case

In the Dormant Commerce Clause case, Nationwide sought an injunction against the Commissioner to preclude enforcement of the statute requiring it to obtain a California prorater's license. Nationwide alleged that the statute violates the Dormant Commerce Clause because it makes licenses

---

[20] To the extent Nationwide also suggests that it will suffer irreparable harm because it must "spend resources to defend against the District Attorneys' meritless claims," we note that "[m]ere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury." *Renegotiation Bd. v. Bannercraft Clothing Co., Inc.*, 415 U.S. 1, 24 (1974).

available only to corporations incorporated under the laws of California. Nationwide is correct.

"[I]n all but the narrowest circumstances, state laws violate the [Dormant] Commerce Clause if they mandate 'differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.'" *Granholm v. Heald*, 544 U.S. 460, 472 (2005) (quoting *Or. Waste Sys., Inc. v. Dep't of Envtl. Quality*, 511 U.S. 93, 99 (1994)). Thus, in general, states "cannot require an out-of-state firm 'to become a resident in order to compete on equal terms.'" *Heald*, 544 U.S. at 475 (quoting *Halliburton Oil Well Cementing Co. v. Reily*, 373 U.S. 64, 72 (1963)). State laws that directly discriminate against out-of-state entities can survive only if the state "demonstrate[s] both that the statute 'serves a legitimate local purpose,' and that this purpose could not be served as well by available nondiscriminatory means." *Maine v. Taylor*, 477 U.S. 131, 138 (1986) (quoting *Hughes v. Oklahoma*, 441 U.S. 322, 336 (1979)).[21] This rule reflects the Framers' concern "that in order to succeed, the new Union would have to avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation." *Hughes*, 441 U.S. at 325.

California's prorater law discriminates on its face against out-of-state economic interests. Anyone acting as a prorater

---

[21] State laws that "burden interstate transactions only incidentally" may also violate the Dormant Commerce Clause "if the burdens they impose on interstate trade are 'clearly excessive in relation to the putative local benefits.'" *Taylor*, 477 U.S. at 138 (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)). Because the statute at issue here directly discriminates against interstate commerce, rather than doing so only incidentally, we need not further consider this alternative test.

in California must first obtain a prorater license from California. Cal. Fin. Code § 12200. On its own, the requirement of state licensure is legitimate, as Nationwide concedes. California prorater licenses, however, "shall *only* be issued to a corporation organized *under the laws of this State* for that purpose." Cal. Fin. Code § 12200.1 (emphasis added). A corporation's state of incorporation is one of its states of residency, even if its operations are physically located elsewhere. *See* 28 U.S.C. § 1332(c)(1). Thus, California's statute does precisely what the Supreme Court says cannot be done except in the "narrowest circumstances," *Heald*, 544 U.S. at 472: it requires any corporation that wants to engage in a certain kind of business within the state to become a resident.

If states were allowed to require local incorporation as a condition of engaging in interstate commerce, then national corporations could be required to incorporate in all 50 states in order to do business—either by creating an individual subsidiary for each state or by some similar means. No matter the specific approach taken, requiring incorporation under the laws of each individual state in order to operate a national business would contribute toward precisely the "Balkanization" the Dormant Commerce Clause is meant to prevent.

The Commissioner argues that the statute is nondiscriminatory because California corporations that are not "organized . . . for [the] purpose" of being a prorater must also create a subsidiary that is organized for that purpose in order to offer prorating services. The correct comparison, however, is between California corporations that are organized for the purpose of being proraters and out-of-state corporations that are organized for the purpose of being

proraters. The in-state corporation may obtain a license directly, while the out-of-state corporation must either incorporate in California or create a subsidiary incorporated in California. The statute therefore discriminates against out-of-state economic interests.

The district court's contrary conclusion is based on a misinterpretation of *Alliant Energy Corp. v. Bie*, 330 F.3d 904 (7th Cir. 2003). The district court interpreted *Alliant Energy* as distinguishing between "the requirement that an out-of-state corporation incorporate an in-state subsidiary to obtain a license" and the requirement "that an out-of-state public utility holding company reincorporate its *parent* corporation in Wisconsin." In fact, *Alliant Energy* turned on a more basic distinction: the statute it upheld required in-state incorporation in order to engage in *intrastate* commerce, while the statute it struck down required in-state incorporation in order to engage in *interstate* commerce. *Id.* at 912. The Seventh Circuit explicitly noted that interstate commerce was "presumably exempted by the terms of" the statute it upheld and "in any event" any application of the statute to interstate commerce was "beyond the scope of this appeal." *Id.* at 912 n.5.

The requirement that an out-of-state corporation incorporate an in-state subsidiary in order to engage in *intrastate* commerce is permissible because intrastate commerce is beyond the scope of the Dormant Commerce Clause, not because requirements to incorporate in-state subsidiaries are always permissible. When a statute regulates

interstate, rather than intrastate, commerce,[22] a requirement of in-state incorporation (even of a subsidiary) is facial discrimination against out-of-state corporations.

The Commissioner does not argue that the statute is a permissible form of discrimination under *Taylor*—that is, the Commissioner does not argue "that the statute 'serves a legitimate local purpose,' and that this purpose could not be served as well by available nondiscriminatory means." *Taylor*, 477 U.S. at 138. We therefore hold that Nationwide is likely to succeed on the merits of its Dormant Commerce Clause challenge to California's prorater licensure law. Because the district court's consideration of irreparable harm, the balance of the equities, and the public interest depended upon its erroneous analysis of the merits of the claim, we vacate the district court's order and remand for consideration of the latter three *Winter* factors and—if they are satisfied—imposition of an appropriate preliminary injunction.

---

[22] We find entirely unpersuasive the Commissioner's suggestion that the California statute affects only intrastate commerce. The California statute seeks to regulate anyone offering prorater services to California residents, even if the prorater (including the personnel and facilities the prorater uses to provide its services) is located outside of the state—and indeed even if the lender to whom the prorater sends the funds is also located outside the state. That is interstate commerce. *Cf. Alliant Energy*, 330 F.3d at 912 n.5 ("Of course, if a utility were provided to Wisconsin users from an out-of-state source—by this we mean that the generation facilities are located out-of-state, not the corporate entity—that would be interstate commerce.").

**CONCLUSION**

The district court's orders dismissing both cases under *Younger* are **REVERSED**. The district court's order denying the preliminary injunction in 15-16253 (the First Amendment case) is **AFFIRMED**. The district court's order denying the preliminary injunction in 15-16220 (the Dormant Commerce Clause case) is **VACATED**. Both cases are **REMANDED** for further proceedings.

---

MONTGOMERY, District Judge, dissenting:

I respectfully dissent from the majority's conclusion that the first element of *Younger* abstention—ongoing state proceedings—is not satisfied in the two cases before us. At the time the state case was filed, no proceedings of substance on the merits had taken place in either of the federal lawsuits, and those cases remained in an embryonic stage. In this factual context, "the principles of *Younger v. Harris* should apply in full force." *Hicks v. Miranda*, 422 U.S. 332, 349 (1975); *see also Younger v. Harris*, 401 U.S. 37, 39 (1971) (reaffirming the "national policy forbidding federal courts to stay or enjoin pending state court proceedings except under special circumstances").

A case has proceeded beyond the embryonic stage when "proceedings of substance on the merits have taken place in the federal court." *Hicks*, 422 U.S. at 349. The Ninth Circuit has identified factors to consider when determining if a case remains embryonic. Factors include when multiple hearings have occurred or when "the District Court's intervention in the case had resulted in a significant change in the relative

position of the parties" *Hoye v. City of Oakland*, 653 F.3d 835, 844 (9th Cir. 2011). None of these factors are present here.

Both of these cases arrived in federal court as a preemptive strike by Nationwide to enjoin state district attorneys from enforcing state statutes in state court. No substantial court action occurred in federal court in either case. The district court did not hold any hearings, conduct any case management conferences, or set any discovery schedule in either case. In both cases, the only federal court action had been the denial of injunctive relief.

The denials of the preliminary injunction motions were not proceedings of substance on the merits. The district judge considered the likelihood of success on the merits as required by *Winter v. Natural Resources Defense Council, Inc*, 555 U.S. 7, 20 (2008). Based on the preliminary nature of the rulings and the denials of injunctive relief, no party's position was significantly changed by the rulings. The cases are functionally indistinguishable from *Hicks*. There, the district judge denied injunctive relief after "finding the proof of irreparable injury to be lacking and an insufficient likelihood of prevailing on the merits to warrant an injunction." 422 U.S. at 338.

The majority applies a quantitative analysis to the number of pages written and the number of cases cited in the district judge's orders denying the motions for preliminary injunctions. The majority views this evidence as the "most important" in concluding the cases were no longer embryonic. *Ante*, at 23. However, the length and thoroughness of a judge's order should not be determinative of whether the proceeding is one of substance on the merits.

The rulings here were not "substantial federal court action" that moved the case beyond *Younger*'s reach. *Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 238 (1984). After the denials of the preliminary injunctions, the cases were no further advanced in federal court than they had been before the rulings.

In addition to ignoring the absence of court proceedings or lack of substantial court action that advanced the stage of these cases, the majority fails to credit that the district judge, who was in the best position to determine the status of each case, concluded that both cases remained in the embryonic stage. Although abstention is not discretionary, the district court judge's view of the development of the case should be considered in determining whether a case is embryonic.

The cases relied on by the majority to conclude that the cases were no longer embryonic are materially distinguishable. In *Adultworld Bookstores v. City of Fresno*, no state court action had been commenced and thus abstention did not turn on the proceedings in federal court. 758 F.2d 1348, 1350–51 (9th Cir. 1985).

Additionally, Circuit precedent holds that the time between when the federal and state cases were filed is of no consequence. *See Polykoff v. Collins*, 816 F.2d 1326, 1332 (9th Cir. 1987) ("Whether the state proceedings are 'pending' is not determined by comparing the commencement dates of the federal and state proceedings."); *M&A Gabaee v. Cmty. Redevelopment Agency of City of L.A.*, 419 F.3d 1036, 1041–42 (9th Cir. 2005) (citing *Polykoff* and rejecting

argument that the commencement dates of the state and federal case are to be considered when deciding if federal case is still embryonic).

I would affirm the judgment of the District Court.